Filed 9/23/24  P. v. Sutherland CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEREMY SHAWN SUTHERLAND,<br><br>    Defendant and Appellant. | C099623<br><br>(Super. Ct. No. CRF01000211001) |

In 2001, Thomas Sparks was found beaten to death and dumped down an embankment in a remote area.  In 2002, a jury found defendant Jeremy Shawn Sutherland guilty of second degree murder.  The trial court sentenced defendant to 15 years to life in s/tate prison.  Defendant appealed and a different panel of this court affirmed the judgment.  (*People v. Sutherland* (Dec. 16, 2003, C041522) [nonpub. opn.].)

In 2021, defendant petitioned for resentencing under Penal Code section 1172.6 (formerly section 1170.95, renumbered as section 1172.6).[1]  Following an evidentiary hearing, the trial court denied the petition.  Defendant appeals.  We affirm.

---

[1]  Further undesignated statutory references are to the Penal Code.  Effective June 30, 2022, section 1170.95 was renumbered as section 1172.6 without substantive change.  (Stats. 2022, ch. 58, § 10.)  We will refer to the section by its new numbering.

1

# I. BACKGROUND

## A. *Defendant's Statement of Facts*

As a preliminary matter, we note that defendant's opening brief does not contain a statement of facts in conformance with California Rules of Court, rules 8.204(a) and 8.360(a). Instead of providing a summary of facts supported by citations to the record, defendant relies on the factual summary from this court's opinion on direct appeal, the presentence probation report, and his lengthy declaration accompanying the petition.

Under section 1172.6, subdivision (d)(3), in an evidentiary hearing, the trial court "may . . . consider the procedural history of the case recited in any prior appellate opinion." This provision has been interpreted to mean the trial court may not consider the *facts* recited in an appellate opinion as evidence. (*People v. Flores* (2022) 76 Cal.App.5th 974, 988 ["the factual summary in an appellate opinion is not evidence that may be considered at an evidentiary hearing to determine a petitioner's eligibility for resentencing"].)

Section 1172.6, subdivision (d)(3) also states that the Evidence Code applies at an evidentiary hearing, meaning that hearsay contained in probation reports is not admissible at the hearing. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1026.) Defendant's declaration is also hearsay offered for its truth. (*Malatka v. Helm* (2010) 188 Cal.App.4th 1074, 1085, fn. 5 [a written declaration "is archetypical hearsay"].) Under section 1172.6, subdivision (d)(3), defendant's declaration would not be admissible absent an applicable exception to the hearsay rule. Defendant does not cite any exception to the hearsay rule.

## B. *Beating Death of Sparks*

On appeal, defendant challenges the sufficiency of the evidence supporting denial of his petition for relief under section 1172.6; therefore, we recite the facts in the light most favorable to the prosecution. (See *People v. Williams* (2020) 57 Cal.App.5th 652, 663.)

Kimberly Raible lived in a mobile home with her two sons. Sparks was a friend who Raible had known for five years. Raible knew Sparks had been in prison but did not know why.

On the evening of January 20, 2001, Raible was staying the night with her two sons at the home of Michael Wayne Griffith. Sparks called Raible saying he wanted to meet at her house later that evening. Raible told Sparks to come to Griffith's house because there was no electricity at her mobile home. That night, defendant and James Shane Taylor arrived at Griffith's house after dropping Sparks off at Raible's home. Defendant and Taylor told Raible that Sparks was waiting at her home, and they were to bring her back. During the conversation, Carla Cline, Raible's longtime friend, spoke up and said that Sparks was a child molester. Raible got very upset. After defendant confirmed by a telephone call with Sparks's former mother-in-law that Sparks was a child molester, Raible said she wanted Sparks out of her house. Defendant and Taylor told Raible they would get Sparks out of her home.

Shortly after the phone call, defendant said he needed "a pipe or something . . . ." Griffith had a tool wall on his porch and there was a pipe wrench on the wall. Defendant, Taylor, and Cline left in defendant's mother's car with defendant driving. When Cline got in the car, she noticed a pipe wrench on the floorboard of the car. As defendant drove, he started to say, "when we get there," but Cline interrupted him and told him not to talk about it. For defendant to say that, it made Cline think he was planning for something bad to happen.

When defendant, Taylor, and Cline got to Raible's house, they went in and found Sparks sitting by the fireplace. Cline got a plate from the kitchen and went into the bedroom to snort some methamphetamine from the plate. Sparks came in and sat next to her on the bed. Cline suddenly heard a loud noise, like a watermelon shattering, and saw Sparks fall back. Someone, Cline did not know who, had come in and hit Sparks. Frightened, Cline rushed out of the room.

3

Cline ran outside and got in the car, but then went back in to get defendant and Taylor. Cline saw defendant and Taylor in the bedroom. Taylor was striking Sparks with an object. Defendant stood at the foot of the bed and did not say or do anything to get Taylor to stop. Cline told Taylor to stop, that Sparks had had enough. Cline saw Sparks lying on the bed. Sparks was not moving. Cline assumed Sparks was dead after the first blow, because of his "exhale of breath." Defendant did not suggest that they call an ambulance, a doctor, or 911 for medical assistance for Sparks. The three left. On the drive, defendant did not appear to be upset or yell at Taylor for what he had done. Taylor and Cline discarded the pipe wrench in a bush.

Darlene Deptuch testified that, around 3:00 a.m. on January 21, 2001, Taylor arrived at her residence with another person (whom she said in court looked like defendant) and asked to borrow her Ford Explorer to pick up Taylor's son. Taylor gave Deptuch $30 and took the SUV.

Cline saw defendant and Taylor in Deptuch's vehicle at Griffith's house. Defendant told Cline that Sparks "was tough" because he was still alive and breathing when defendant and Taylor went to pick him up. Cline realized then that Sparks was not killed by the first blow.

Raible also saw defendant, Taylor, and Cline at Griffith's house that morning. They arrived in a teal green SUV. Raible thanked defendant for getting rid of Sparks. Defendant made a gesture that Raible understood to mean, "yeah, okay." When Raible returned to her mobile home, she noticed that an afghan, bedding, and a sleeping bag were missing — items she identified in court. Raible's mattress was bloodstained and there was a pool of blood on the floor in her bedroom.

Deptuch testified that she had cleaned her car inside and out the day before Taylor took it. When Deptuch got the car back from defendant and Taylor, it was a mess. Inside, there was soda sprayed all over, as well as cigarettes everywhere and splinters. There was mud all over the outside. The car had a foul smell Deptuch could not identify.

4

On January 27, 2001, Sparks's body was discovered in a remote area. It had been pushed down a steep embankment where Taylor's brother sometimes disposed of dead sheep. Bloodstained items from Raible's house, including an afghan, a sleeping bag, and other bedding, were found near the body.

On March 16, 2001, defendant placed telephone calls from jail. In one call, defendant said to tell Taylor and Cline not to say anything to the police. Defendant said, "That's the only way we are going to fucking beat this shit."

At trial, Dr. Susan Comfort testified that she performed an autopsy on Sparks's body. Sparks's skull was fractured in two places. In one fracture, his skull was perforated and brain impacted. The other fracture on the opposite side did not reach the brain. Both injuries were hard blunt trauma from an instrument. Nothing Dr. Comfort saw was inconsistent with one person striking a blow from one side and another person striking a blow from the other side. Sparks's face also had been beaten with a fist more than a dozen times. Dr. Comfort concluded that Sparks died from a combination of the skull injuries and blows to the face. Dr. Comfort further testified that "[i]t's more likely that the cause of death was those two penetrating or depressed injuries of the skull."

C.     *Jury Trial, Verdict, Sentencing, and Appeal.*

An information charged Cline, Taylor, and defendant with Sparks's murder (§ 187, subd. (a)), and further alleged that Sparks was murdered during a burglary (§ 190.2, subd. (a)(17)), with additional prior serious felony and prior strike allegations (§§ 667, subd. (a), 1170.12) against Cline.

Cline agreed to testify in defendant's trial in exchange for a reduced sentence and pleaded guilty to voluntary manslaughter (§ 192, subd. (a)). In exchange for a stipulated sentence of 21 years in state prison, Taylor pleaded no contest to voluntary manslaughter (§ 192, subd. (a)), kidnapping (§ 207), felony false imprisonment by force (§ 236), and two counts of first degree residential burglary (§ 459), as well as enhancements.

5

At trial, the jury was instructed, among other things, with CALJIC No. 3.01 on direct aiding and abetting, CALJIC No. 8.21 on felony murder, and CALJIC No. 8.27 on felony murder as an aider and abettor.

The jury found defendant guilty of second degree murder. Since the jury did not find defendant guilty of first degree murder, it also did not find true the allegation that Sparks was killed during a burglary. The trial court sentenced defendant to 15 years to life in state prison.

Defendant appealed. In affirming the judgment, this court rejected various arguments, including that the trial court erred in admitting extradjudicial statements by Taylor and defendant, giving or refusing various jury instructions, and telling prospective jurors in voir dire that this was not a death penalty case, and also that the prosecutor misstated the burden of proof. (*People v. Sutherland*, *supra*, C041522.)

D.     *Petition for Resentencing*

In May 2021, defendant filed a petition for resentencing under former section 1170.95. In November 2021, the trial court issued an order to show cause.

At the evidentiary hearing held on August 28, 2023, the parties stipulated to the trial court's consideration of the trial transcript. As defense counsel requested, the trial court also agreed to consider this court's unpublished opinion. No additional testimony was presented at the hearing. Following argument, the trial court took the matter under submission. On October 4, 2023, the trial court issued a written ruling. The court denied the petition, ruling that defendant "was a major participant in the beating [of Sparks], the injuries from which were the cause of this victim's death. It is unnecessary to pinpoint the particular violent blow that was the final, fatal strike. It is sufficient that both [defendant] and his co-defendant equally beat this victim on the motive of their belief he was a sex offender. [¶] Because there was no 'underling felony' activity which led to an eventual killing, defendant was not convicted under the natural and probable consequences theory of homicide culpability. He was, however, a major participant in the

6

murderous beating in which he acted with the intent to kill, as the jury found, and [as] the evidence presented at the hearing pursuant to Penal Code section 1172.6 established beyond a reasonable doubt."

Defendant filed a timely appeal.

## II.  DISCUSSION

### A.  *Senate Bills Nos. 1437 and 775 and Standard of Review*

Senate Bill No. 1437 (Senate Bill 1437) (Stats. 2018, ch. 1015, § 1) was enacted " 'to more equitably sentence offenders in accordance with their involvement in homicides.' [Citation.]  The Legislature recognized, 'It is a bedrock principle of the law and of equity that a person should be punished for his or her actions according to his or her own level of individual culpability.' [Citation.]  With this purpose in mind, Senate Bill 1437 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citation.]  Outside of the felony-murder rule, 'a conviction for murder requires that a person act with malice aforethought.  A person's culpability for murder must be premised upon that person's own actions and subjective mens rea.' " (*People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*).)

Senate Bill 1437 altered substantive homicide law in two areas.  (*Curiel, supra,* 15 Cal.5th at p. 448.)  First, it narrowed the felony-murder rule to apply only where a defendant was the actual killer, aided and abetted the actual killer with intent to kill, or was a major participant in the underlying felony and acted with reckless indifference to human life.  (*Ibid.*; § 189, subd. (e).)  Second, Senate Bill 1437 required that, outside of felony murder, " 'a principal in a crime shall act with malice aforethought' to be convicted of murder.  (§ 188, subd. (a)(3).)" (*Curiel,* at p. 449.)  " 'Malice shall not be imputed to a person solely on his or her participation in a crime.' " (*Ibid.*)  This

7

requirement eliminated the natural and probable consequences doctrine, under which an accomplice " 'is guilty not only of the offense he or she directly aided and abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the "natural and probable consequence" of the crime the accomplice aided and abetted (i.e., the nontarget offense).' " (*Ibid.*)

Senate Bill 1437 also created former section 1170.95 (now section 1172.6), "a procedural mechanism 'for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief' " where the substantive changes in homicide law affected the defendant's conviction. (*Curiel*, *supra*, 15 Cal.5th at p. 449.) Two years later, the Legislature enacted Senate Bill No. 775 (Stats. 2021, ch. 551, § 1), inter alia, to expand the population of offenders eligible for relief and clarify the procedure and burden of proof at the evidentiary hearing stage of a petition for relief. (*Curiel*, at p. 449.)

Section 1172.6, subdivision (a) provides, in relevant part, that "A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime . . . may file a petition with the court that sentenced the petitioner to have the petitioner's murder . . . conviction vacated and to be resentenced on any remaining counts . . . ." Where, as here, the trial court has determined that a defendant has made a prima facie showing eligibility for relief, issued an order to show cause, and conducts an evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) The parties may offer new or additional evidence at the hearing, and the trial court sits as an independent fact finder to determine beyond a reasonable doubt whether the defendant is guilty of murder under a valid theory. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

8

On appeal, we review the trial court's findings at an evidentiary hearing for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) Under that standard, we " ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Ibid.*) We presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence. (*People v. Owens*, *supra*, 78 Cal.App.5th at p. 1022; see also *People v. Thomas* (2017) 15 Cal.App.5th 1063, 1071 [defendant on substantial evidence review "bears an 'enormous burden' "].) A reviewing court will not reverse unless no hypothesis exists with sufficient substantial evidence to support the trial court's decision. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

B.      *Sufficiency of the Evidence*

Defendant contends the trial court's order denying his petition for section 1172.6 relief should be reversed, "because there is lacking proof of express malice." Defendant argues that the trial court found beyond a reasonable doubt that defendant "partook in beating Sparks to death," but "the evidence viewed in a light most favorable to judgment does not show this, nor does it disclose substantial evidence of express malice." The People respond that sufficient evidence supports the trial court's finding that defendant was the actual killer or aided and abetted the murder with intent to kill. Separately, the People contend sufficient evidence supports the trial court's finding that defendant was a major participant who acted with reckless indifference to human life.

We conclude that aiding and abetting is a still-valid theory that aligns best with the evidence and substantial evidence supports it. As the trial court noted in its written ruling, the jury was instructed on direct aiding and abetting. Accordingly, we need not consider whether substantial evidence supports alternative theories still valid after Senate

9

Bill 1437, i.e., that defendant was the actual killer of Sparks or was a major participant in the killing who acted with reckless indifference to human life.

"Before the Legislature amended section 188, the natural and probable consequences doctrine constituted an exception to the requirement of either express or implied malice for a murder conviction. [Citation.] Now, since the amendment, the natural and probable consequences doctrine can no longer support a murder conviction, but the change did not 'alter the law regarding the criminal liability of direct aiders and abettors of murder . . . . One who directly aids and abets another who commits murder is thus liable for murder under the new law just as he or she was liable under the old law.' " (*People v. Vargas* (2022) 84 Cal.App.5th 943, 953; see also *People v. Reyes* (2023) 14 Cal.5th 981, 990; *People v. Coley* (2022) 77 Cal.App.5th 539, 546 ["A theory of direct aiding and abetting remains a valid theory after Senate Bill No. 1437"].)

" '[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.' " (*People v. Vargas*, *supra*, 84 Cal.App.5th at pp. 953-954.)

"Proof of intent may be made by way of inferences from a defendant's volitional acts which are done with knowledge of the probable consequences, and presence at the scene of the crime, while insufficient of itself to make one an aider and abettor, is one factor which tends to show intent. Other factors which may be considered include the defendant's failure to take steps to prevent the commission of the crime, companionship, and conduct before and after the crime." (*People v. Pitts* (1990) 223 Cal.App.3d 606, 892-893; see also *People v. Garcia* (2008) 168 Cal.App.4th 261, 273 [factors considered in determining whether a person aided or abetted a crime " 'include presence at the scene

of the crime, failure to take steps to attempt to prevent the commission of a crime, companionship, flight, and conduct before and after the crime' "].)

Defendant's aiding and abetting the killing of Sparks finds substantial support in the evidence adduced at trial. To begin with, as to the actions of the direct perpetrator, Cline saw Taylor strike Sparks multiple times with an object. Dr. Comfort testified that Sparks likely died from skull injuries inflicted by an instrument. The evidence that defendant aided and abetted Taylor includes that defendant and his friend Taylor offered to get Sparks out of Raible's home. Defendant said he needed the "pipe" that was brought to Raible's home and ultimately used to kill Sparks. Defendant drove the car to Raible's home. On the way, defendant started to describe what they should do to Sparks when they got there, until Cline cut him off, fearing what he was going to say. Cline thought something bad was going to happen and that defendant was planning something based on what he started to say. Defendant was present in the bedroom when Taylor struck Sparks. Defendant did not attempt to restrain Taylor by word or action, nor did he suggest that they should obtain medical assistance for the gravely injured Sparks. Defendant drove the car from Raible's home and showed no distress as they drove from the scene. Later that night, defendant helped dispose of Sparks's body. At noon the next day, Cline saw defendant in the vehicle Taylor borrowed from Deptuch and defendant told Cline that Sparks was tough, because he was still alive and breathing when defendant and Taylor went to dispose of the body.

Defendant contends substantial evidence of aiding and abetting was lacking. Defendant argues that: The prosecution's main witness, Cline, testified in exchange for a reduced sentence and was a drug user; her testimony was inaccurate and she admitted lying to the police; Cline did not testify that defendant handled the pipe wrench at any point; Cline did not understand from defendant's remark, which she interrupted, that defendant meant to kill Sparks; Cline was not able to identify the person who struck the first blow with the pipe wrench; she saw only Taylor strike Sparks; Cline did not hear

11

defendant encourage Taylor as he struck Sparks; and Taylor told her to get rid of the pipe wrench. Defendant asserts that "Cline's testimony, as the chief prosecution witness, must be assigned its proper weight."

This argument misconstrues our role on appeal. Defendant's arguments do not ask us to evaluate whether substantial evidence exists but rather to reweigh the evidence, drawing inferences favorable to the defense. This we cannot do. In applying the substantial evidence test, appellate courts " 'do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Nelson* (2011) 51 Cal.4th 198, 210; *People v. Wilson* (2023) 90 Cal.App.5th 903, 916 [in reviewing an order denying a section 1172.6 petition, "it is not our role to reweigh the evidence"].)

Having reviewed the evidence in the light most favorable to the trial court's decision, we conclude that the substantial evidence supports the decision that defendant was guilty of murder on a direct aiding and abetting theory.

C.     *Defendant's Youth*

Defendant contends the trial should have taken his youth into account in evaluating his mental state. (See *People v. Pittman* (2023) 96 Cal.App.5th 400, 416-417 [a defendant's youth defined as 25 years of age or younger is relevant to the level of culpability in felony murder and implied malice murder cases].) "[C]ase law discussing the differences in brain development among youthful offenders (in contrast to their adult counterparts) stress two areas of divergence: (1) their relative impulsivity; and (2) their vulnerability to peer pressure." (*People v. Oliver* (2023) 90 Cal.App.5th 466, 489 (*Oliver*); see also *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1377 [the " 'hallmark features' " of youth include " 'immaturity, impetuosity, and failure to appreciate risks and consequences' "].)

Defendant asserts that the trial court's failure to mention his age at the evidentiary hearing indicates the court gave no consideration to his youth in denying the petition. The People do not dispute that defendant's age—22 years old at the time of the crime—

12

was a relevant factor for the trial court to consider. However, the People note that defense counsel argued the issue at some length in the petition, suggesting that the trial court considered defendant's youth but found other factors more compelling. We generally agree with the People that the trial court's silence in this instance does not equate to failure to consider defendant's age. "[T]he fact that a court did not specifically mention certain evidence does not mean that the court 'ignored' that evidence." (*People v. Jones* (2022) 86 Cal.App.5th 1076, 1092.)

We further agree with the People that any hypothetical error by the trial court in failing to consider defendant's youth would be harmless. Courts are in agreement that the state law standard of prejudicial error applies—whether it is "reasonably probable that a result more favorable to [defendant] would have been reached in the absence of error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; see also *Oliver*, *supra*, 90 Cal.App.5th at p. 489, fn. 8 [applying *Watson* standard to defendant's claim that trial court failed to consider his youth at § 1172.6 evidentiary hearing]; accord, *People v. Pittman*, *supra*, 96 Cal.App.5th at p. 418; *People v. Jimenez* (2024) 103 Cal.App.5th 994.)

We conclude that it is not reasonably probable that a more favorable result for defendant would have been reached had the trial court considered his youth. Defendant was actually less than two months short of his 23rd birthday at time of the crime. (*Oliver*, *supra*, 90 Cal.App.5th at p. 489 [referring to 23-year-old offender, "the presumption of immaturity weakens as defendant approaches 26"]; *People v. Jimenez*, *supra*, 103 Cal.App.5th at p. 1007 [referring to a 19-year-old offender, "the younger the defendant, the less mature he is"].)

Moreover, while "a youthful offender may be vulnerable to 'peer pressure' from his cohorts" (*People v. Jimenez*, *supra*, 103 Cal.App.5th at p. 1007), there was no evidence defendant was induced by Taylor to participate in the events that led to Sparks's death (*Oliver*, *supra*, 90 Cal.App.5th at p. 489). Both defendant and Taylor equally offered to remove Sparks from Raible's home. Defendant then evidently took the lead,

13

stating he needed a deadly weapon, driving them in his mother's car to Raible's home, and attempting to discuss what they planned to do to Sparks on the drive. Thus, defendant did not "show 'a transient rashness' "or " 'inability to assess consequences,' " but a principal role in planning to violently force Sparks from Raible's home. (*Id.* at p. 490.) Defendant was well aware of what might occur when he and Taylor confronted Sparks, as shown by the lack of shock or distress defendant exhibited when Taylor struck Sparks with the pipe wrench and gravely injured him. The only surprise defendant evinced was that Sparks was still alive when he and Taylor went to dispose of the body.

Under the circumstances, it is not reasonably probable the trial court would have granted defendant's petition had the court considered his age at the time of the crime, if in fact, the court failed to do so.

### III. DISPOSITION

The trial court's order denying defendant's petition under section 1172.6 is affirmed.

/s/_____
Wiseman, J.*

We concur:


/s/_____
Hull, Acting P. J.


/s/_____
Boulware Eurie, J.

_____

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.